dash zero eight one companies people versus the annual Mills. And you got to call it again. Good morning. Would both or I don't know how many attorneys are going to argue. Would you both step up to the podium? We just called Nathaniel McEwren. Anyone's going to argue, step up and please identify yourselves for the record. Good morning. My name is Ginger Odom from the Office of the State Appellate Defender for the Appellant Nathaniel McEwren. Ms. Odom. Good morning. I'm Assistant State's Attorney, Veronica Calderon-Malavia for the people. All right. Ms. Calderon-Malavia, would you say your name again? I'm sorry. Veronica Calderon-Malavia. Oh, Malavia. All right. Good morning to both of you. All right. Ms. Odom, you may step up. Each of you will have about 15 minutes to present oral argument. And from that, Ms. Odom, you may save out some time for rebuttal. Okay. I'd like to save a few minutes for rebuttal. All right. Um, so we raised three issues in the brief and today I'd like to touch on, I'd like to focus on the first issue, reasonable doubt, and also touch briefly on the second issue, uh, the armed habitual criminal statute. In this case, during a 5.30 AM parole search, an IDOC agent found a firearm hidden in a closet in the second bedroom, um, of Mr. McEwren's two bedroom apartment. The second bedroom had no bed in it. Is that correct? You're right. It had no, um, clothes in there, no dresser. That's not correct. It had clothes hanging in the closet, clothes piled on the floor, clothes in the laundry basket. Was there any indication of a lease or any mail, anything in the second bedroom indicating that Mr. McEwren, uh, had subleased that to somebody else? Any, any other indication that anybody else was living there? Um, well, there was, like you say, the second bed, the second bed in the second bedroom, Mr. McEwren's bed had a bed, um, in this bedroom where the, the no bed bedroom, where the gun was found, the smaller bedroom, right? There's no, there was no indication of a lease at all. And to your point, there were papers found in that bedroom, um, and none of them were tied to Mr. McEwren, but were they at all linked to the other man that he, I can't remember his name off hand, David Singleton. Thank you. Um, were they indicated that they were Mr. Singleton's papers? Uh, there was no indication about any of those papers, uh, who they belonged to, the clothes, the shoes that were found in that bedroom were not, um, tied to Mr. McEwren. They weren't necessarily, they weren't, it was not established that they were the same. And the only testimony regarding Mr. Singleton came from the defendant's girlfriend, correct? That's the only person who raised the issue of Mr. Singleton being an occupant of that apartment, right? Uh, right. Felicia Adams testified, and her testimony that Mr. Singleton had lived in the apartment for several years was unrebutted by, um, any other evidence, you know, there was nothing to contradict her testimony. So, um, here we have no actual possession. As I said, there's a two bedroom apartment, unrebutted testimony that Mr. McEwren had a roommate, and the gun was hidden in the roommate's closet in an opaque bag under a pile of laundry in the laundry basket. The police did not run the prints, um, on the gun. Um, even after officer, even though officer McClain admitted, um, that she did not know who, who the gun belonged to, and the state did not run the serial number on the gun. So this case is really sort of like, um, it's like a law school final exam question. We have a lot of law students today. Right. Except that, well, in this case there's not, there's only one right answer. Um, let me ask you this. Did the roommate, uh, testify in this case? No, sir. Uh, so how, uh, did the, uh, uh, how would a jury be able to conclude that there really was a roommate at all? Based on, um, Felicia Adams, unrebutted testimony and the way that the apartment was set up. Why did the jury have to believe her? No, but her testimony was not implausible and it was certainly unimpeached. There was no evidence that David Singleton did not exist. And doesn't the jury get that instruction about they decide the witnesses and they may consider any interest, bias, or prejudice that witness may have in their testimony? Certainly. It's been a while since I gave that IPI, but I remember it. Right, right. So isn't that a jury function? Certainly. It is a jury function and is the function of this court to review all of the evidence in the light most favorable to the state and where our argument is that no rational trier of fact, the state failed to present sufficient evidence of, um, that Mr. McEwery had, had control or knowledge. The state failed to present, to establish either. So as the control, don't the cases suggest that if you live in an apartment, you can control what is there and it can be joint. Okay. So that's a two part question. So I'll answer both parts of them separately. Um, and that's certainly the state's argument that cohabitation establishes control over the entire premises. But this is not a per se rule. Um, this court held in Wolski that when there is a shared space, the state still must establish corroborating evidence, but isn't that an issue here as to whether there was shared space and, uh, in the second bedroom, there was no bed, there was a bed, there was no bedroom, uh, in the second bedroom, you're right, there was no bed, but there was another bed. There was a bed in the living room. Yeah. But doesn't the jury decide in the first instance, really, whether there was another person living there. And at the time that the police went to conduct the parole, it was actually, was it a violation or did they? It was a probation search. Just a standard probation search. So when they got there, it's uncontradicted that the only person there was this defendant. There was no one else sleeping there on the couch in the living room, right? It wasn't on the couch, but right. There was no other person in the apartment at the time. And that, again, um, it was uncontradicted by the state that Mr. Singleton lived in the apartment and that he worked nights and that he. Uncontradicted. Are you actually saying that when someone puts in evidence, that that suddenly means the jury must conclude that that is actually, no, that is not, that is not my argument. Because to say it's uncontradicted doesn't really have any real meaning in the law when the binder of fact makes the determination of whether or not that evidence has any meaning. Right. I see what you're saying. And so I'm saying that the state was unable to contradict Ms. Adams' testimony. They were unable to impeach her testimony as to whether or not Mr. Singleton lived in the apartment. And they were unable to rebut her testimony. But the jury would decide whether or not she had an interest or bias. Certainly, as you pointed out. Wasn't she still in a relationship with him at the time that she testified? Yes. Or am I wrong? Okay. As far as I can, as far as the evidence, um, seems to establish, they were still in a continuing relationship, although they no longer lived together. Why? Aren't you really asking us, Ms. Odom, to reweigh the testimony? No, I'm not. I'm asking you to reweigh, to, um, to, uh, review the evidence under the constructive possession. And here the state did not establish control and did not establish knowledge. The state points to Mr., um, Mr. McEwren's, um, I mean, here the, the firearm... Isn't knowledge generally, uh, determined by circumstances? In other words, is it, is it frequently found that a defendant will say, I knew it was there, or is it something that the jury or the judge will have to infer based on everything they hear? Right. And the state is required to present corroborating evidence to establish, um, a person's knowledge. And, um, I want to, um, so I want to, I forgot to answer your joint possession question, so if I can make a little segue back to joint possession. Even joint possession, um, so they had joint possession, David Singleton and Mr. McEwren's shared joint possession of the apartment, but not of this, not of the discrete rooms in the apartment. Um, so while they shared, they cohabited, they would share common areas, but not necessarily each individual roommate's room. What if the jury rejected your cohabitation theory? It's in fact, that's kind of what they did. I mean, you're, you're asking us to say that this was cohabitation, but that's not really our job. Our function is not to reweigh and decide this was cohabitation. That was testimony that was presented, but the jury by its verdict actually suggests otherwise, that they did not believe this cohabitation theory. So let's, let's talk about if they rejected that, go, go to how the state failed in their proof. Well, I think that what I would like to do is now pivot to what else the jury heard. Right? And this is the armed habitual criminal statute. The armed habitual criminal, I mean, Illinois Supreme Court has recognized that other crimes evidence is generally inadmissible. So the Illinois Supreme Court held that such evidence over persuades the jury, which might convict the defendant only because he or she is a bad person deserving punishment. And this is the perfect that this perfectly encapsulates what you're arguing, that the jury rejected this, rejected Ms. Adams' testimony and rejected the defense because here the interplay between the armed habitual criminal statute's purpose and its inherently prejudicial requirements cannot withstand rational basis scrutiny. But the jury didn't hear what the specific offenses were, correct? If they were both former gun offenses, I think, and the jury heard that he's been carrying a gun and convicted of it twice before, yeah, that would make the tendency for them to believe he had a gun again, but this time they just thought he was convicted of a felony on this date under this indictment number and convicted on this date. How is that prejudicial? Well, words have power, right? So names have power. Yeah. Armed habitual criminal. The statute is called, the statute he's charged with committing is being an armed habitual criminal. This tells the jury that Mr. McEwren has made a habit of committing crimes and of being armed. This is the prejudice inherent in it. And not only were they told about one prior felony conviction, and I think what you're, you're distinguishing the old chief case and in Walker where the felonies were not named. And certainly that's true. The felonies were not named here. However, the rationale and old Walker and, um, and, and sorry, old chief and Walker illustrate the gravity and danger, um, of the prejudicial impact of the disclosure of these prior offenses. And they provide support to Mr. McEwren's claim that this prejudice outweighs the state's interest in enacting the statute. So while the state was met with, you know, there's two beds, there's, um, there's two bedrooms, um, and, uh, no actual possession and Ms. Uh, Adam's testimony that there is a roommate and that he lives in the smaller bedroom and even though, and the jury is presented with evidence that the gun is hidden, it's in an opaque bag, it's in the roommate's room, they are also at the same time being told that Mr. McEwren is an armed habitual criminal from the beginning of trial all the way through to the end. And the state capitalizes on this as they're able to by calling him a two-time convicted felon. So in the face of this evidence that, you know, we have a hidden gun in the apartment being told that he's an armed habitual criminal and he has a habit of being armed and have, and has a habit of being a criminal, wait, I thought they weren't told that he has a habit of being armed. I said, yes, the evidence that they're told along with this, with the name of the statute, they are told that he's an armed habitual criminal, which means that he's habitually armed and that he habitually commits crime. This over-persuaded the jury on the basis of insufficient evidence to nonetheless find him guilty of being an armed habitual criminal. Has your argument still been rejected? That, that there's this prejudice inherent and that, I mean, haven't your, isn't this really a constitutional challenge that's been sort of rejected already? Um, that Apple, the appellate court has rejected that. Illinois Supreme Court has never weighed in on whether or not two prior convictions and the name armed habitual criminal over, is overly persuasive and unnecessarily prejudicial to the defendant. However, those cases, um, the prior cases only nominally, Adams, yes, Adams and, uh, Davis, Adams, Allen and Davis. Yes. Those are the cases. You're correct. Those are the names of the cases. We addressed those in the group. I mean, we acknowledge that this argument has not met with success. However, when this case has been, um, addressed by those cases, the prejudicial element has only been nominally addressed in those cases. Um, they, the courts did not address the indisputable and needless prejudice inherent in other crimes offense, and therefore this court should not follow those cases. They're only, you know, they're not mandatory. Um, they're not, uh, mandatory. This court doesn't have to follow them. You know, it's your position here that someone lived in the other bedroom, yet the evidence shows there's no bed. So a reasonable jury certainly could conclude that they don't believe that. Well, this, okay. I see what you're saying. And you know, it is important to note that this, this search happened during the summertime and the other bedroom was much smaller. So it's certainly plausible that the bed would have been moved out into the living room because Ms. Adams is no longer living in the apartment and that's a much smaller room. The jury's also going to consider that there's nobody there to cooperate with this. There's nobody, uh, right. And there's no, there's no case law that says that the, that the possessor of the gun has to be present during the search. Certainly there's a number of cases where the defendant who is actually convicted of constructive possession wasn't in the home at the time of the search, but here's there. Any testimony that the defendant told the parole agents and CPD when they came into the apartment, that's my roommate's room. That, I never go in there. Was there any testimony that he ever said anything about a roommate? No, Mr. McKeering did not. There's no evidence that Mr. McKeering spoke to the agents at all, but there's also no evidence. He didn't testify. The agents would have testified whether or not he made a statement. Okay. So to be clear, officer McClain did not testify that Mr. McKeering made a statement to her. Agent Dumas did not testify that Mr. McKeering made a statement to him. However, his silence on the fact of the gun is actually an indication. It supports Mr. McKeering's lack of knowledge about the gun. He can't disclaim a gun that he doesn't know his own. Or the fact that he knows not to make statements to the parole agent or the officer. That could also show that. I mean, yes, he's been caught up in the criminal justice system before. I mean, the jury knows that this is a parole search. If you're on parole, are you going to have your gun out in the open or are I don't know the answer to that. Well, I do. I think the answer is clear that if you're on parole and you're not supposed to have a gun, you're certainly not going to leave it out in the open for the world to see. Every parolee knows that they're subject to these searches unannounced. Right. Well, I don't think you're going to presupposes that presupposes knowledge and possession of the gun. I mean, that sort of strips the state of the requirement to prove knowledge and control, right? If we just imagine the history period. Again, knowledge and intent are often proved by circumstantial evidence only. Certainly. So here, those circumstances have not supported that. The jury could have concluded was evidence that he knew it was there because he had it hidden actually in a bag, under clothes, in a basket, hidden in a closet. In a room where there is no bed, there is no bed. There's clothes, there's boxes of papers, and none of those papers, the state did not present any evidence. Look, this search was conducted by 12 agents from the IDOC and police officers. Certainly they know how to establish constructive possession. None of these papers were tied to the defendant. There's no evidence that the police picked up a single paper in that room that had Mr. McKeering's name on it. There's, and nor were the shoes or clothes matched or there was no evidence that the shoes and clothes were the same shoes and clothes or the same sizes as those that were found in Mr. McKeering's room. I mean, and the police didn't even, if those papers had been tied to Mr. McKeering, the state would have presented it. Furthermore, when the gun is hidden and there seems, and there's a second bedroom and the gun is hidden, this is the perfect time to run a fingerprint analysis and the state- What's your best case for reasonable doubt on these facts? Wolski. Wolski is the best case on these facts. There, the police conduct a search in a basement apartment. The mom of the defendant tells the police, my son, you know, he, we, they share this apartment together. The, so it's established that the defendant lives in the basement apartment and that the mom said that the, that this other son lived there too. And on those facts, this court determined that where there's a, where there's a shared apartment with the brother and no corroborating evidence, like here, nothing corroborating, um, that Mr. McKeering is tied to the place where the gun is found, the state failed to prove constructive possession. Similarly, in Messiah's, this court following Wolski said that when there's no corroborating evidence, tying the contraband to the defendant, showing control and knowledge to the defendant in the place where the contraband is to establish constructive possession. So these points that we've talked about demonstrate conclusively that the state failed to establish that Mr. McKeering constructively possessed the gun that was wrapped in an opaque gray bag, hidden in the laundry basket under a bunch of laundry in his, in his, uh, roommate's closet. So for these reasons, and those in the brief, we asked this court to reverse Mr. uh, McKeering's conviction for being an armed habitual criminal and to find that the armed habitual criminal statute armed habitual criminal statute is unconstitutional. All right. Thank you. Good morning, your honors counsel. Again, I'm assistant state's attorney, Veronica Calderon-Malavia representing the people may please the center of a court. Your honors defendant wants this court to ignore all the reasonable inferences in favor of the state and draw them in his favor, but this is not the standard. Jackson v. Virginia establishes that a reviewing court must view the evidence in light most favorable to the prosecution, but that includes drawing all reasonable inferences in favor of the state and justice McBride. It is true that the standard, this standard is especially important in constructive possession cases because those cases by their very nature are usually proven by circumstantial evidence and not direct evidence. What about Volsky and Macy's? Let's start right off the bat. Can you tell us why those cases we should not? I think in, um, in a reasonable doubt case, the most important thing is to look at the evidence here and follow the standard. Every, every reasonable doubt case is significant and we have, and what's important is like the jury trials determination here. The jury found incredible, uh, Felicia Adams testimony. And though it may not, it may be rebutted, the jury is still charged with the duty to evaluate her demeanor as well as her potential bias. And the jury here knew that Felicia Adams was biased because she was defendant's long-term girlfriend and therefore had a motive to lie. And if you look at her testimony, it's unbelievable. It doesn't ring true. She claimed that she lived with defendant and David Singleton, a roommate for eight months in a very small apartment. Um, but she had no idea. She had, she didn't know much about Singleton. She had no idea when Singleton and the defendant met. She never really talked to him, you know, and, but it's eight months. There's weekends. I'm sure Mr. Mr. Singleton existed. He didn't work every day. The jury was absolutely free to disregard anything she said. Correct. Correct. And if you look at her testimony, they had reason to, again, she knew nothing about Singleton. She know where he worked, what type of work he did. Um, she claimed that she never really spoke to him even though they were alone. She admitted they were alone on, on occasions during that period of time. Um, and she also claimed that during those eight months, um, in that very small apartment, she never got, had the opportunity to look into that second bedroom and see that he had no furnishings, that there were no bed. So apart from his name, Adams knew nothing about the so-called, uh, roommate. And so your honors, Adam's testimony, moreover, was contrary to human nature. You would know the basics about, of your roommate in a, if you'd live with that person in eight months. And so the jury who was charged with using their common human experience didn't believe her and rejected the existence of a roommate. Ms. Calderon, can you address counsel's argument that an armed, habitual criminal, you're telling jury, this is the charge, armed, habitual criminal somehow deprives the defendant of due process because it's indicating to the jury, this is pretty bad. He's armed, he's habitual, and he's an offender. Just the words alone kind of give the jury an indication that we have a history. Okay. Again, that she makes a substitute due process based on the propensity to commit, uh, uh, an offense, the rule against the admission of propensity. It's a facial challenge. However, that, again, that challenge has been rejected by this court and Adams and Davis and the United States Supreme Court decision, Spencer versus Texas, which found that a similar recidivist scheme was constitutional. Um, and the defendant really doesn't provide any basis to overrule this precedent. At bottom, defendant's due process claim is founded on the common law rule that evidence of other crimes is not admissible to show a defendant's propensity to commit an offense. However, their rule, your honors, is one of common law origin. It's not of constitutional magnitude. And as Spencer recognized, the legislature is free to abrogate this rule and has elected to do so in domestic violence cases and sex offense cases. In those cases, it is permissible to admit other crimes evidence in order to prove defense defendant's propensity to commit the charge and unrelated, um, offense. And the Illinois Supreme Court has found these schemes to be constitution in people versus dabs and people versus Donahoe. So therefore the legislature had the police power to define a recidivist offense where a past crime was an element of the offense. And again, here, any prejudice, undue prejudice was avoided. The state stipulated to the fact that defendant, uh, had been convicted of prior qualifying offenses. So the jury didn't know that those prior offenses was first degree murder and residential burglary. So based on this stipulation, um, you know, the defendant cannot show any prejudice and certainly can't show that it's unconstitutional on its face. It really isn't prejudice. It's undue. Undue. It's always undue prejudice. She can't show any undue prejudice. And going back to the reasonable doubt, the evidence shows, those that defendant had knowledge of the gun as well as immediate and exclusive control of that, um, of the, of the apartment. Defender has, defendant of the second bedroom. Defender resided in the apartment since 2014. And the evidence shows that he used that smaller room really as storage. There was no furnishings that suggested that it was being used as a bedroom by another occupant. Granted there was no bed, no dresser, no television, no chair, no desk. But the, but on the floor inside the closet, there were boxes, containers of paper, and a pile of clothes, men, and the basket where eventually the, the hun was, the gun was hidden and found by the agents. And there was only a few articles of clothing hanging on hangers in the closet. And although there was evidence that there may have been a shoebox, there were no shoes in that room. Absolutely no, no, no evidence of any shoes. And also showing that it was used as a storage room right in front of the closet, there was what appears to be the top of a dining room cabinet. Right in front of the closet. It wasn't flush next to, next to the wall. And it was partially, uh, blocking the closet. So it didn't look lived in. It didn't look occupied. It didn't look like it was being used as a bedroom. In contrast, you look at defendant's room. It was, it looked lived in, it looked occupied. It had a bed with bed sheets, a comforter and pillows. There was a window with matching curtains. There was a fan near the bed. There was a wardrobe and a dresser with men's clothes piled on it. And the closet was nearly full with clothes hanging on hangers. Was there some delay, uh, wasn't there a delay in the answering of the door in this case? Yes, your honor. That's part of defendant's conduct that showed that he had the knowledge of the gun and immediate control of, um, uh, of the, of the second bedroom of the apartment. Agent DeMas had to, on the, on the day of the compliance check, agent DeMas had to repeatedly knock on the door and defendant didn't immediately open, open it. He, he asked the agents to wait. The agents waited for about three minutes and they could hear movement inside the apartment. And therefore, at that point, defendant had the opportunity to hide the firearm and he also had access. He was the only one to the second bedroom. He was the only one in the apartment at the time. And even through the testimony of Felicia Adams, who was frequently in that apartment, lived there, that second bedroom didn't have, was not, uh, you couldn't lock it. So even, even she admitted as much that defendant could have hidden the gun in that second bedroom. Defendant also had the motive, a motive. He was aware that under the terms of his parole, that he cannot possess a firearm. And he knew that if he was caught with a firearm, he'd be in violation of his parole and that he could be sent back to the IEDOC. So your honors, when you view the totality of the evidence and the reasonable inferences in light most favorable to the state, there's no question that there was constructive possession, the defendant was proven beyond a reasonable doubt of constructive possession of the gun. However, even if this court rejects the credibility of the determination of the jury and finds that defendant had a roommate, the evidence I just discussed. I don't know. Why would you say, if we reject, what, how do we reject credibility findings? I agree. I mean, so why are you, why are you telling us? I won't waste my time. I agree. I think there's something, there's something there that I don't agree with. I don't think we're here to reweigh the credibility of the witnesses. I don't think that we're allowed to do that. Now that doesn't mean that we can't reject, you know, a conclusion of a jury or a judge. Absolutely. But at the same time, I don't think that our job really is to determine here, you know, that we should start reweighing the evidence and the credibility of the witnesses. I totally agree. And I think under the standard in Jackson versus Virginia and in Collins, that the defendant, the jury's credibility determination here, and they clearly rejected the existence of this so-called witness. And for, for the reasons stated, I would ask that this court affirm defendant's conviction for being a habitual criminal. All right. Thank you. So I'll do a brief rebuttal. So you're right. You're not, you're not here to reject the credibility determination of, of the jury, but you are here to evaluate the conclusion. And in Messiahs and in Wolsky, this court rejected the conclusions of the finders of fact in those cases because there was shared space and there was no corroborating evidence that the defendant had control or knowledge. Well, talking about those two cases and, and particularly another one in your case, in cases involving joint control of an area, involving joint control, courts generally look for corroborating evidence. Okay. So to me, unless you can convince us that the jury didn't reject your joint theory, I don't see how we're getting to this. We did not make a joint theory. No, we are saying that Mr. Singleton had exclusive control. I'm sorry. Okay. No, but aren't you, haven't you suggested that there's, that, that we have to be, well, that you're saying we should conclude without any question that there was somebody else living there. I'm saying that the evidence supports that there was somebody else living there. But the jury rejected that theory. And this court can reject that conclusion. But how can we reject that conclusion? Because there was no corroborating evidence. But the cases that you've supported basically say, where there's joint control, if the jury in this case concluded there was no joint control, where are you going with your argument? They rejected the argument that this, there was another person that lived there. We can't go outside that and say, this is a case where another person lived there. Well, it's not clear that the jury did reject that. The jury may well have believed that Mr. Singleton lived in the apartment and that they shared all of the space. Now, the state's theory is that this was a storage room, right? And they say that this storage room was really untidy. But Mr., Mr., I mean, that the state of the two separate bedrooms itself suggests that there was another person living there because Mr. Singleton's bedroom was very untidy. The clothes were on the floor. Only a few things were, were hanging. But in Mr. McCurian's bedroom, there were more clothes and those clothes were hanging in the closet. So the description and the pictures alone suggest that if Mr. McCurian was going to have control over the entire apartment and that that was his storage area, that he would keep it in the same fashion that he kept his bedroom. So, and Adams, you know, they point out that Ms. Adams said that Mr. McCurian may have hidden a gun. He may, that Mr. Singleton, he may have hidden a gun in Mr. Singleton's laundry basket. But that is pure speculation. There's no... Is it speculation for you to stand here and tell us that that was Mr. Singleton's basket? Certainly not. When Ms. Adams testified that that was his bedroom. How can you, how can you credibly say that this other woman said that this laundry basket belonged to a man who she hardly ever saw and she never went in the room and he closed the door? How can you say that her testimony supports what you're arguing right now, that that was Mr. Singleton's laundry basket? Ms., because Ms. Adams testified, and it's not implausible, her testimony was in no way implausible. Her failure to become intimate with Mr. Singleton does not mean that Mr. Singleton was a ghost or did not exist. But the jury could have easily concluded that. Certainly. And that, and that's the problem is that you're... No, and then, so then that just... ...has to reweigh everything everybody's... I don't think that I... The jury decided that. Okay. Well, respectfully, I disagree. I'm asking you to reject their conclusion that they came to in the face of no corroborating evidence for this secret gun that was hidden in a basket. And your argument would be the same even if, even if Mr. Singleton didn't live there. You still would argue that there was no constructive possession, right? How could I, no, I, I, I disagree with that. I disagree with that. There's no evidence of a roommate and no testimony of a roommate. Then you lose. Yes. All right. Okay. Um, yes, there's no, I mean, there's... Well, when a gun is found somewhere else, you, you wouldn't ever make an argument that, that, that person didn't possess it. I can't comprehensively answer your question in the, in the absence of facts, you know, in a different case. In this case, when there is evidence that there was another person living in the apartment, I think it's quite, I don't think that it's, um, unethical for me to make an argument that the other person, that there's evidence of the other person and that the other person occupied that room, that the gun that is found in that room hidden secretly belonged to the person who is, who is, you know, who lived in that room. So that's why I'm calling it Mr. Singleton's laundry basket, because that's based entirely on Ms. Adams' testimony. Um, as to, um, you know, the state also argues that he has a motive to, um, to, to hide the gun by that same token, because he's on probation or parole. By that same token, he also has a motive to not possess a gun. Um, and so, and, and so, you know, he doesn't know that his roommate has a gun. That's the same motive. As to Spencer, yes, Spencer, Spencer, um, was addressing the Texas armed habitual criminal statutes. However, Spencer was decided 30 years before old chief and Walker and that, and, and does not incorporate or acknowledge their holdings or reasoning necessarily. It can't because it happened before them. But if you look at Spencer and contrast it with old chief and Walker, there has been a marked change in the United States Supreme court view regarding the importance of the risk of prejudice to a, to a defendant's due process right to a fair trial. The Spencer court characterized this danger in 1967 as merely the possibility of some collateral prejudice. However, when we compare that with the language in old chief, there's a specific acknowledgement that propensity evidence certainly carries the danger of unfair prejudice, but a jury may generalize bad character onto a defendant. Furthermore, notwithstanding the United States Supreme court in Spencer, the Illinois Supreme, Illinois is certainly free to than what is afforded under the United States constitution as interpreted by the United States Supreme court. Also in Spencer, there was only one prior conviction in two of the cases. One was a prior murder case and one was a federal bank robbery case. And all those priors were named to the jury, a practice that the United States Supreme court subsequently banned in old chief and Walker, which we didn't have here. No, they were not. But there were more than one offense named. And again, he was called an armed habitual criminal and he's facing a gun charge. So telling the jury that he's armed and that he's an habitual criminal, and then asking them to decide whether or not he had this gun, it's unfairly and unnecessarily prejudicial to the defense. So for those reasons, we ask that you reverse the conviction and find the armed habitual criminal statute unconstitutional. All right. Thank you. Both cases well argued, well briefed and will be taken under advisement.